2013 OK CIV APP 75

James COEN, Brent Cooper, Ronald A. Majors, Timothy O'Sullivan, Mia Oven, Frank Panzer, Larry Payne, Timothy Purcell, and Darrell Weakland, Plaintiffs/Appellees/Counter–Appellants,

v.

SEMGROUP ENERGY PARTNERS G.P., LLC n/k/a Blueknight Energy Partners G.P., LLC, Defendant/Appellant/Counter–Appellee.

Nos. 108,373, 108,924.

Court of Civil Appeals of Oklahoma, Division No. 4.

June 12, 2013.

Robert B. Sartin, Thomas D. Robertson, Timothy L. Rogers, Barrow & Grimm, P.C., Tulsa, Oklahoma, for Plaintiffs/Appellees.

Don G. Holladay, Heidi J. Long, Holladay & Chilton PLLC, Oklahoma City, Oklahoma, for Defendant/Appellant.

JERRY L. GOODMAN, Judge.

¶ 1 This is the appeal and counter-appeal arising out of the trial court's May 3, 2010, order awarding James Coen, Brent Cooper, Ronald A. Majors, Timothy O'Sullivan, Frank Panzer, Larry Payne, Timothy Purcell, and Darrell Weakland (collectively "Plaintiffs," unless addressed individually) the collective sum of $1,019,424.00 on their wage and breach of contract claims.[1],[2] SemGroup Energy Partners, G.P., L.L.C. n/k/a Blueknight Energy Partners, G.P., L.L.C. (hereinafter "Defendant") also appeals an October 22, 2010, order granting Plaintiffs an attorney's fee and costs of $151,832.17.[3] This Court filed its original Opinion on December 20, 2012. Defendant filed a petition for rehearing on January 9, 2013. Having reviewed the petition for rehearing and response thereto, this Court finds the petition should be, and is hereby, granted. The original

Opinion is withdrawn and this Opinion on Rehearing is substituted in its place. Based upon our review of the facts and applicable law, we affirm in part, reverse in part, and remand with directions.

### FACTS

¶ 2 SemGroup, L.P. (SemGroup) was a privately-held limited partnership in Tulsa, Oklahoma. SemGroup owned a number of operating affiliates, including SemCrude, L.L.C., SemGas, L.L.C., and SemMaterials, L.L.C., *inter alia*. Plaintiffs were executives of either SemGroup or an affiliate, although they were technically employed by SemManagement, L.L.C., a SemGroup affiliate formed in 2003 to provide payroll services for SemGroup and the affiliates.

¶ 3 In July of 2007, SemGroup formed a publicly-traded master limited partnership, SemGroup Energy Partners, L.P., L.L.C., n/k/a Blueknight Energy Partners, L.P., L.L.C. (BKEP), whose general partner is Defendant. At the time of BKEP's initial public offering, SemGroup caused Defendant to adopt a written Long–Term Incentive Plan (Plan). Employees, consultants, and directors of SemGroup, Defendant, and the affiliates were eligible to participate in the Plan. Gregory Wallace, an executive of SemGroup, determined it would be beneficial for the management of the affiliates to buy phantom units in the initial public offering to convey management's belief in Defendant's value. Wallace arranged financing with a local bank for each participant, who, as a requirement of the loan, pledged their phantom units to the bank.

¶ 4 Plaintiffs participated in the Plan by signing an Employee Phantom Unit Agreement (Agreement) dated July 23, 2007. Plaintiffs were granted 10,000 phantom units.[4] Phantom unit is defined in the Plan as "a phantom (notional) unit granted under

---

1. The court awarded a liquidated damages penalty to all Plaintiffs, *sans* O'Sullivan, in the total amount of $933,000.00. The court awarded Plaintiffs Cooper, Major, and Panzer contractual damages totaling $86,424.00.

2. Although listed in the journal entry, Mia Oven dismissed her claim prior to trial.

3. Defendant's motion to strike portions of Plaintiffs' reply brief is denied.

4. Cooper was granted 40,000 phantom units.

the Plan which entitles the Participant to receive, in the discretion of the Committee, a Unit or an amount of cash equal to the Fair Market Value of a Unit." A unit is defined as "a common unit of the Partnership." The Plan provides the awards would be made in annual increments over a period of four (4) years, or 25% a year, until the total number of phantom units granted to a Plan participant was reached. However, awards automatically vest upon a "change of control," an event when, generally, a person other than SemGroup became owner of fifty percent (50%) or more of the combined voting power of the equity interests in Defendant. Upon vesting, awards were to be delivered within sixty (60) days. The value of a unit is predicated on its fair market value, *i.e.,* the closing sales price of a unit on the principal national securities exchange or other market.

¶ 5 The Plan was administered by Defendant's Board of Directors and its Compensation Committee. The Plan gave the Board broad discretion to "amend, alter, suspend, discontinue, or terminate the Plan in any manner." In addition, the Plan provides "[N]o person shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Participants. The terms and conditions of Awards need not be the same with respect to each recipient."

¶ 6 A change of control occurred on July 18, 2008, when private equity funds exercised the terms of a secured loan made to SemGroup and foreclosed on the latter's general partnership interest in BKEP. SemGroup filed for Chapter 11 bankruptcy protection on July 21, 2008. As a result of the change of control, all phantom units immediately vested and delivery was due within sixty (60) days.

¶ 7 Defendant subsequently informed participants, including Plaintiffs, that a change of control had occurred, the phantom units had vested, and they "were entitled to receive one common unit of SemGroup Energy Partners, L.P. for each vested Phantom Unit." In addition, Defendant informed them the delivery of the common units was a taxable event and created a withholding obligation based on the closing price of a common unit on the date the units were transferred, which was expected to be July 28, 2008. Participants were given two (2) options: 1) to pay in cash the required tax withholding and receive the full number of common units due to them upon vesting; or 2) elect to have the partnership pay the tax withholdings on their behalf by withholding common units and receive the remainder of the common units due upon vesting. Plaintiffs elected an option and executed a form provided by Defendant.

¶ 8 Subsequently, Defendant's Board determined it did not want to reward individuals whose actions may have harmed the company and partnership and ultimately led to the change in control. Thus, it concluded: 1) certain individuals, whom the Board considered essential to the continuance of the running of the company, would receive units if they signed an undertaking to return the units in the event it was determined they had participated in wrongdoing; 2) units would not be issued for those persons who no longer worked for the partnership and worked primarily for the parent, with the issue to be revisited at a later time; and 3) for everyone else, units would be issued.[5] Plaintiffs fell within the second group and were not issued their units. Approximately 290,000 units were issued to other Plan participants on August 13, 2008, at a unit price of $10.70.

¶ 9 Thereafter, Defendant failed to file its form 10–Q with the Securities Exchange Commission (SEC) for the second quarter of 2008. As a result, it was legally prohibited from issuing units after August 15, 2008. Defendant's non-compliance existed until August 24, 2009. In September of 2009, Defendant finally distributed Plaintiffs' units, all at a unit price lower than $10.70. In addition, Defendant issued a W-2 to Plaintiffs, withholding federal, state, Medicare, and social security taxes from the distribution of units.

¶ 10 On July 8, 2009, Plaintiffs filed suit against Defendant, asserting breach of contract and a claim for unpaid wages pursuant to the Protection of Labor Act, 40 O.S.2001 and Supp. 2005, §§ 165.1 et seq. A bench trial was held on April 1 and 5, 2010, wherein

---

5. See also Defendant's Chairman of the Board, Duke R. Ligon's, trial testimony.

Plaintiffs asserted Defendant breached the Plan by failing to issue the units within sixty (60) days of the change of control. Plaintiffs sought the difference between the price on the date they ultimately received their units and the price of the units on August 13, 2008, the date other recipients timely received their units. Plaintiffs further claimed the units constituted wages and that Defendant's failure to timely remit the wages entitled them to liquidated damages. Defendant disagreed, asserting, *inter alia,* an employer-employee relationship did not exist and therefore the incentive compensation awards did not meet the statutory definition of wages. Finally, Defendant asserted if the units did constitute wages, a bona fide disagreement existed and that its decision to withhold payment was protected under the business judgment rule.

¶ 11 On April 14, 2010, the trial court issued findings of fact and conclusions of law finding an employer-employee relationship, the awards came within the statutory definition of wages under 40 O.S.2001 and Supp. 2005, §§ 165.1(4), Defendant violated Oklahoma's wage law by failing to timely issue the units upon termination of employment, a bona fide disagreement did not exist, and the liquidated damages penalty of 40 O.S.2001 and Supp. 2005, §§ 164.3 was applicable. The court awarded a liquidated damages penalty to Plaintiffs, *sans* O'Sullivan, in the total amount of $933,000.00.[6] Finally, the court awarded Plaintiffs Cooper, Major, and Panzer contractual damages totaling $86,424.00. A final journal entry of judgment was entered on May 3, 2010. Both parties appeal the trial court's judgment.

¶ 12 Plaintiffs subsequently filed a motion for an attorney's fee and costs as prevailing parties in a civil action to recover for labor or services rendered pursuant to 12 O.S.2001 and Supp. 2002, §§ 936 and as prevailing

parties in a wage claim pursuant to 40 O.S. 2001, §§ 165.9. Defendant objected. By order issued October 22, 2010, the trial court awarded Plaintiffs $151,832.17 in fees and costs, which included a thirty percent (30%) fee enhancement. Defendant further appeals this award of an attorney's fee and costs to Plaintiffs.[7]

## STANDARD OF REVIEW

¶ 13 This appeal involves numerous factual and legal conclusions making two (2) standards of review applicable. When reviewing an action at law where trial to a jury has been waived, "the trial judge's determination of the facts bears the force of a verdict ... that must be affirmed if supported by any competent evidence." *Bradley v. Clark,* 1990 OK 73, ¶ 3, 804 P.2d 425, 427. "This court on appeal will not weigh the evidence or determine the credibility of the witnesses, that being the province of the trial court." *Leatherman v. Freeman,* 1954 OK 5, ¶ 18, 266 P.2d 473, 476. However, when an issue presents a question of law, a *de novo* standard applies. *Tibbetts v. Sight 'n Sound Appl. Ctrs., Inc.,* 2003 OK 72, ¶ 4, 77 P.3d 1042, 1046.

## ANALYSIS

### I. Defendant's Appeal

#### A. Protection of Labor Act, 40 O.S.2001 and Supp. 2005, § 165.1 et seq.

¶ 14 For its first proposition of error, Defendant asserts the trial court erred in holding the units, which are discretionary incentive compensation awards, constitute wages pursuant to §§ 165.1 *et seq.* because: 1) an employer-employee relationship did not exist; 2) the awards were unrelated to Plaintiffs' labor or services rendered but were contingent on Defendant's performance and finan-

---

6. In calculating damages, the trial court determined the average price for a unit during the sixty (60) days following the change in control. The average price was $9.33. If a Plaintiff sold his units at a rate lower than the average rate, the court held he was entitled to damages for the difference. If a Plaintiff was still holding his units at the time of trial, the court determined he did not mitigate damages and was not entitled to damages. The court held all Plaintiffs were enti-

tled to the liquidated damages penalty except O'Sullivan, who the court found had not been terminated. Wages were not awarded because the units had been transferred prior to trial.

7. By order filed on November 23, 2010, the Oklahoma Supreme Court ordered Appeal Nos. 108,-373 and 108,924 consolidated under surviving No. 108,373.

cial success; 3) the awards were discretionary and were not payable on a recurrent basis; 4) the awards were not payable only in U.S. currency; 5) the awards were not negotiated terms of Plaintiffs' employment; and 6) Plaintiffs failed to present evidence they were terminated. Finally, if the units are considered wages, Defendant asserts a bona fide disagreement existed and that they properly used their business judgment in declining to timely issue the units.

¶ 15 Plaintiffs disagree, asserting the units are wages because they were provided as compensation for services rendered to Defendant, citing the explicit purpose of the Plan as well as their individual testimony they provided services for or on Defendant's behalf. In addition, Plaintiffs assert the units, comparable to stock options, are wages if the option to purchase is provided in a written agreement, signed by the employer, and the purchase of stock was required, citing 40 O.S.2001 and Supp. 2005, §§ 165.1(4) and Oklahoma Administrative Code (OAC) 380:30–1–9.

■ ¶ 16 Whether an award of units constitutes a wage under the Act is a question of statutory construction, which is a question of law that we review *de novo. Arrow Tool &*

*Gauge v. Mead,* 2000 OK 86, ¶ 6, 16 P.3d 1120, 1123.

■ ¶ 17 To establish a wage claim under the Oklahoma Protection of Labor Act (Act), 40 O.S.2001 and Supp. 2005, §§ 165.1 *et seq.*, an employee has the burden of establishing the following elements: 1) an employer-employee relationship;[8] 2) wages are earned and due or provided in an established policy;[9] 3) employment was terminated;[10] and 4) the employer failed to pay the employee's wages at the next regular pay day after termination.[11]

¶ 18 Wages is defined as:

compensation owed by an employer to an employee for labor or services rendered, including salaries, commissions, holiday and vacation pay, overtime pay, severance or dismissal pay, bonuses and other similar advantages agreed upon between the employer and the employee, which are earned and due, or provided by the employer to his employees in an established policy, whether the amount is determined on a time, task, piece, commission or other basis of calculation;

40 O.S.2001 and Supp. 2005, §§ 165.1(4).

¶ 19 Pursuant to this definition, an employee's "wages" are the amount the employer

---

**8.** *See Title* 40 O.S.2001 and Supp.2005, §§ 165.1 and 165.2.

**9.** Title 40 O.S.2001 and Supp.2005, §§ 165.1(4) provides: "Wages" means compensation owed by an employer to an employee for labor or services rendered, including salaries, commissions, holiday and vacation pay, overtime pay, severance or dismissal pay, bonuses and other similar advantages agreed upon between the employer and the employee, which are earned and due, or provided by the employer to his employees in an established policy, whether the amount is determined on a time, task, piece, commission or other basis of calculation; ... Wages shall be paid "at least twice each calendar month on regular paydays designated in advance by the employer ... [and] shall be paid in lawful money of the United States[.]" 40 O.S.2001 and Supp. 2009, §§ 165.2. Wages are further defined in the OAC 380:30–1–8, as "those payments that an employee receives for services rendered in the regular course and scope of employment...." Finally, benefits are "special wages that are paid at certain times under certain conditions, according to the terms of the employment agreement. These include vacation, sick pay, paid

holidays, severance, bonuses, and other similar advantages...." OAC 380:30–1–8.

**10.** Title 40 O.S.2001 and Supp.2005, §§ 165.3(A): "Whenever an employee's employment terminates,...."

**11.** An Oklahoma employer is required to pay an employee's wages in full by the next regular payday following termination. Section 165.3 provides: A. Whenever an employee's employment terminates, the employer shall pay the employee's wages in full, less offsets and less any amount over which a bona fide disagreement exists, as defined by Section 165.1 of this title, at the next regular designated payday established for the pay period in which the work was performed ...

If wages are not paid in full at the next regular pay day after termination, an employer is liable for liquidated damages of "two percent (2%) of the unpaid wages for each day upon which such failure shall continue after the day the wages were earned and due if the employer willfully withheld wages over which there was no bona fide disagreement;...." 40 O.S.2001 and Supp. 2005, §§ 165.3(B).

has offered or promised to pay as compensation for the employee's labor or services rendered and are earned and due. In the present case, Plaintiffs received their regular wage. This wage was paid to Plaintiffs for their ordinary performance of labor or services rendered for their employer.

¶ 20 In addition to this regular wage, Plaintiffs participated in the Plan, which sets forth a participants' entitlement to phantom units. Plaintiffs contend the award of units is wages under the Act. The Plan provides, in part:

1. Purpose of the Plan.

[The Plan] ... is intended to promote the interests of the Partnership and the Company and their Affiliates ... by providing to employees, consultants, and directors of the Company and its Affiliates who perform services for or on behalf of the Partnership and its subsidiaries incentive compensation awards for superior performance that are based on Units.... The Plan is also contemplated to enhance the ability of the Company and its Affiliates to attract and retain the services of individuals who are essential for the growth and profitability of the Partnership and its subsidiaries and to encourage them to devote their best efforts to advancing the business of the Partnership and its subsidiaries.

* * *

2. Definitions.

* * *

"Phantom Unit" means a phantom (notional) Unit granted under the Plan which entitles the Participant to receive, in the discretion of the Committee, a Unit or an amount of cash equal to the Fair Market Value of a Unit.

* * *

6. Awards.

* * *

(c) Phantom Units. The Committee shall have the authority to determine the Employees, Consultants and Directors to whom Phantom Units shall be granted, the number of Phantom Units to be granted ..., the Restricted Period, the time or conditions under which the Phantom Units may become vested or forfeited, which may include, without limitation, the accelerated vesting upon the achievement of specified performance goals, and such other terms and conditions as the Committee may establish with respect to such Awards, include whether [distribution equivalent rights] are granted with respect to such Phantom Units.

* * *

9. Change of Control.

Unless specifically provided otherwise in the Award Agreement, upon a Change of Control ..., all outstanding Awards shall automatically vest or become exercisable in full, as the case may be. In this regard, all Restricted Periods shall terminate.

* * *

11. General Provisions.

(a) No Rights to Award. No Person shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Participants. The

(b) terms and conditions of Awards need not be the same with respect to each recipient.

* * *

■ ¶ 21 Oklahoma has not addressed the issue before this Court. Other jurisdictions interpreting similar statutory provisions to Oklahoma's have held such incentive compensation plans do not constitute wages if the award is based on factors beyond the scope of the employee's labor or services rendered, is not based on the employee's own productivity, is not guaranteed, is left to the employer's discretion, *inter alia*. See e.g., *Int'l Paper Co. v. Suwyn*, 978 F.Supp. 506, 514 (S.D.N.Y.1997)(executive's management incentive plan award did not constitute wages because the award was not based on performance and was not a guaranteed term of employment); *Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 783 A.2d 667, 673 (2001)(profit sharing bonus not wages despite inclusion of bonuses under statutory definition of wage when award of bonus was dependent on employer discretion or factors other than employee's efforts); *Weems v. Citigroup, Inc.*, 289 Conn. 769, 961 A.2d 349, 357 (2008)(bonuses awarded solely on a dis-

cretionary basis and tied to the performance and profitability of the company and not to the ascertainable efforts of the particular employee were not wages); *Ziotas v. Reardon Law Firm, P.C.,* 296 Conn. 579, 997 A.2d 453, 458 (2010)("Although employee was contractually entitled to a bonus, the amount was indeterminate and discretionary. Thus, even though the employee had a justified expectation of additional compensation, the relationship between performance and compensation was still attenuated because the amount of the bonus was discretionary and dependent on factors other than the employee's performance."); and *Tischmann v. ITT/Sheraton Corp.,* 882 F.Supp. 1358, 1369 (S.D.N.Y.1995)("Under New York law, incentive compensation based on factors falling outside the scope of the employee's actual work is precluded from statutory coverage"). *See also Reilly v. Natwest Mkts. Group, Inc.,* 181 F.3d 253, 264–65 (2d Cir.1999)(pay guaranteed under bonus formula and not left to the employer's discretion did constitute wages).

¶ 22 We have carefully reviewed the Plan. It is, by its very terms, an incentive compensation plan designed to increase corporate and individual performance. The Plan's goals are "to attract and retain the services of individuals who are essential for the growth and profitability of the Partnership and its subsidiaries and to encourage them to devote their best efforts to advancing the business" and for providing "superior performance." However, a participant's expectation of entitlement to phantom units, and the number of units, derives exclusively from the terms of the Plan and corresponding Agreement. It does not depend on a participant's own performance, *i.e.,* labor or services rendered. It is not a product of a participant's past performance but an incentive to encourage future performance. In addition, entitlement under the Plan is clearly discretionary until phantom units vest. Defendant's Board possessed the authority to "amend, alter, suspend, discontinue, or terminate the Plan in any manner," "without the consent of any Participant, ... or beneficiary of an Award...." Thus, until a phantom unit

vests, a participant has no interest in the additional compensation regardless of the participant's labor or services rendered or whether the performance of that labor or service was ordinary or extraordinary.

¶ 23 Furthermore, Plaintiffs' entitlement to phantom units was triggered upon a change in control. Thus, their entitlement is based on factors outside the scope of their labor or services rendered and was not based on their own productivity. Therefore, prior to vesting Plaintiffs had no interest in the additional compensation, *i.e.,* it was not guaranteed and was subject to Defendant's discretion. Finally, because the value of a unit is subject to the financial success or failure of the company, the Plan does not create an expectation or entitlement to a specific wage.[12] Accordingly, in reviewing the Plan against the weight of authority from other jurisdictions, we find the units do not constitute wages under the Act.

¶ 24 We further find the record is devoid of evidentiary support that Plaintiffs' employment with Defendant was terminated. The trial court found as follows:

> Except as to Tim O'Sullivan, Defendant failed to pay wages due to each Plaintiff upon separation when it failed to deliver the Units as required by the Plan and the individual Unit Agreements. Defendant violated 40 O.S. §§ 165.2 when it failed to pay wages due to each Plaintiff other than O'Sullivan after termination of employment.

Contrary to the court's finding, the record does not establish Plaintiffs were terminated from Defendant's employ or the date of that termination. Plaintiffs, as well as the trial court, identified the change in control as the triggering event establishing Plaintiffs' entitlement to units under the Plan. However, a change in control under the Plan sufficient to vest the phantom units in Plaintiffs is not the equivalent of a termination of employment. Plaintiffs' testimony on this element was, at best, contradictory and ambiguous and is therefore insufficient to establish this essential element of their wage claim.

---

**12.** The value of a phantom unit is predicated on a unit's fair market value.

¶ 25 For example, Majors testified that after the change in control Plaintiffs continued to provide services to Defendant.

A. [   ] In fact, all of us still understood we were following on with the obligations under the [Plan].

Payne, on the other hand, testified he no longer provided services directly to Defendant after SemGroup's bankruptcy. Notably, the bankruptcy occurred after the change in control. O'Sullivan testified he is currently employed by SemGroup Corporation, the successor company to SemGroup. O'Sullivan asserted, however, that although he has been continuously employed by Sem-Group n/k/a SemGroup Corporation, when SemGroup's affiliation ended with Defendant, his employment with Defendant ended, triggering its duty to timely pay wages. O'Sullivan was unsure exactly when the affiliation ended:

Q. When did that affiliation stop?

A. Well, technically, I really wouldn't know from a legal standpoint, but, you know, we came—when I say "we," I'm talking about SemGroup Corp—emerged from bankruptcy in December of 2009. So certainly by that point in time, I would say the affiliation stopped. Prior to that though, I think that the relationship between the two companies continued well into 2009.

Panzer testified he was terminated from his position as president of SemMaterials. However, Panzer did not state when he was terminated and whether he was also terminated from Defendant's employment. Without this testimony, the Court is left to speculate.[13]

¶ 26 Although a change in control establishes a participant's entitlement to phantom units under the Plan, this triggering event under the Plan does not establish or equate to a termination of employment. Plaintiffs' own testimony establishes they continued to provide services for Defendant after the change in control. Thus, the change in control was not tantamount to a termination of employment. Accordingly, Plaintiffs' evidence before the trial court is insufficient to meet their burden of production, i.e., there is insufficient evidence to establish Plaintiffs were terminated from Defendant's employ, an essential element of their wage claim.[14] Based on the evidentiary material before this Court on appeal, we can only speculate that Plaintiffs' employment with Defendant was terminated and the date of such termination for purposes of their wage claim. The record is devoid of this evidence.

¶ 27 Accordingly, that portion of the trial court's May 3, 2010, order holding the units are wages and awarding Plaintiffs' liquidated damages pursuant to the Oklahoma Protection of Labor Act, 40 O.S.2001 and Supp. 2005, §§ 165.1 et seq., is in error and is reversed.[15]

■■■ ¶ 28 With respect to Cooper, he testified he suffers from Multiple Sclerosis (MS), was terminated from his employment on July 16, 2008, prior to the change of control, because of his disability, and that he filed for disability on July 17, 2008. Cooper was awarded short- and long-term disability, although he is unaware of the exact date. Section 4(a) of the Agreement, Forfeiture of Award, provides:

If the Participant's employment with the Company and all Affiliates is terminated by Participant's employer without Cause, or by reason of death or Disability, all unvested Phantom Units shall immediately vest and the Restricted Period shall terminate as of the date of the Participant's termination.

Disability is defined in the Agreement as:

[ ] the Participant either (i) is unable to engage in any substantial gainful activity

---

13. Cooper will be discussed infra.

14. Defendant's Chairmen of the Board testified and the Board's minutes provide that "units would not be issued for those persons who no longer worked for the partnership and worked primarily for the parent." Such evidence does not establish Plaintiffs were terminated and the date thereof.

15. As a result of Plaintiffs' failure to establish essential elements of their wage claim, the Court will not address the remaining elements of their wage claim, i.e., an employer-employee relationship and that the employer failed to pay the employees' wages at the next regular pay day after termination.

by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months or (ii) the Participant is, by reason of any medically determinable physical or mental impairment ..., receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Company or any entity that would be considered a single "service recipient" with the Company....

The trial court held:

[Cooper] did not "resign" from his employment with SemGroup, as that term is contemplated in the [Agreement]. That agreement specifically provides that all Phantom Units are immediately vested when a participant becomes disabled. He became disabled in early July 2008, and with that event his Phantom Units became fully vested. [Cooper's] award is not covered by the change in control....

¶ 29 We agree with the trial court that Cooper's award is governed by §§ 4(a). Thus, Cooper's phantom units vested on July 16, 2008, and Defendant had sixty (60) days to deliver the units. However, as previously discussed, Cooper's units are not wages under the Act. Accordingly, based on the record and applicable law, the trial court's May 3, 2010, order awarding Cooper liquidated damages pursuant to the Oklahoma Protection of Labor Act, 40 O.S.2001 and Supp. 2005, §§ 165.1 *et seq.*, is also in error and is reversed.

### B. Breach of Contract

¶ 30 For its second proposition of error, Defendant asserts the trial court erred by finding it breached the Plan and Agreement by failing to deliver Plaintiffs' units within sixty (60) days of vesting. Defendant contends the Plan and Agreement contained provisions granting its' Board and Compensation Committee complete discretion in administering awards, including whether to deliver an award if to do so would violate any applicable law, rule, or regulation. Defendant further asserts it was unable to deliver the units because it became noncompliant with its SEC filing obligation. Finally, Defendant contends the Board and Compensation Committee exercised its business judgment and good faith discretion in administering the Plan and Agreement.

¶ 31 Plaintiffs disagree, asserting the court correctly found Defendant breached the agreements by failing to deliver the units within sixty (60) days of vesting. Plaintiffs assert the defense of impossibility is unavailable because Defendant could have fulfilled its contractual obligations by timely issuing the units prior to the SEC suspension, which it alone created, or through cash payments.

¶ 32 In order to prove a breach of contract, a plaintiff must prove three (3) elements: 1) formation of a contract; 2) a breach of the contract; and 3) actual damages suffered from the breach. *Digital Design Group, Inc. v. Information Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834, 843.

¶ 33 In the present case, the parties do not dispute the existence of the contract. Plaintiffs participated in the Plan by signing an Agreement dated July 23, 2007. The Agreement and Plan provide Plaintiffs' phantom units vested upon a change of control and delivery of the units were due within sixty (60) days. However, Defendant's Board retained broad discretion under the parties' agreements to administer the Plan, including discretion to "amend, alter, suspend, discontinue, or terminate the Plan in any manner...." This discretion further included determining if and when to distribute awards. Paragraph 11(a) of the Plan specifically provides:

*No Rights to Award.* No Person shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Participants. The terms and conditions of Awards need not be the same with respect to each recipient.

In addition, ¶ 11(f) provides:

*Other Laws.* The Committee may refuse to issue or transfer any Units or other consideration under an Award if, in its sole discretion, it determines that the issuance or transfer of such Units or such other consideration might violate any applicable

law or regulation, the rules of the principal securities exchange on which the Units are then traded, or entitle the Partnership or an Affiliate to recover the same under Section 16(b) of the Exchange Act,....

Finally, ¶ 6 of the Agreement provides:

Until delivery of Units as described in Section 3(c), the Participant shall have no rights as a unitholder as a result of the grant of Phantom Units hereunder. The Company shall not be obligated to deliver any Units if counsel to the Company determines that such sale or delivery would violate any applicable law or any rule or regulations of any governmental authority or any rule or regulation of, or agreement of the Company with, any securities exchange or association upon which the Units are listed or quoted. The Company shall in no event be obligated to take any affirmative action in order to cause the delivery of Units to comply with any such law, rule, regulations or agreement.

¶ 34 Upon our review of the record and applicable law, we agree with the trial court that Defendant breached its contract with Plaintiffs. Although Defendant has great latitude and discretion in administering its incentive compensation plan, including, *inter alia,* establishing requirements for participation and vesting of phantom units, once a phantom unit has vested, Defendant has no discretion to rescind or refuse to comply with that which it has contractually obligated itself to provide.

¶ 35 A vested right is the power to do certain actions or possess certain things lawfully and is substantially a property right. *State ex rel. Edmondson v. Cemetery Co., Inc.,* 2005 OK CIV APP 74, ¶ 12, 122 P.3d 480, 483–84 (citation omitted). It may be created by common law, statute, or contract. *Id.* Rights are "vested" when the right of enjoyment, present or prospective, has become the property of a person as a present interest. *Baker v. Tulsa Bldg. & Loan Ass'n,* 1936 OK 568, ¶ 8, 179 Okla. 432, 66 P.2d 45, 48. Once created or conferred by contract or existing laws, it is protected from invasion. *State ex rel. Edmondson,* 2005 OK CIV APP 74, at ¶ 12, 122 P.3d at 483–84.

¶ 36 In the present case, Plaintiffs' phantom units vested on July 18, 2008, when a change in control occurred. Pursuant to the Plan, Defendant had sixty (60) days to deliver the units. Defendant failed to timely deliver the units, asserting two (2) justifications: 1) it exercised its business judgment by determining it did not want to deliver units to individuals who may have participated in SemGroup's demise; and 2) the SEC suspension prohibited it from doing so. The trial court rejected Defendant's justifications:

Defendant is estopped from asserting the defense that it was not possible to issue to Plaintiffs the Units owed to them because of the SEC suspension from trading. Defendant had ample opportunity before that time to honor the terms of the ·contract and issue the Phantom Units or pay them in cash, property or a combination of those options. Defendant did issue units to most of the participants in the LTIP plan, but chose not to issue units to the Plaintiffs. Defendant's failure to follow SEC regulations cannot be used as a defense to the claims of Plaintiffs. Defendant alone created the suspension; it cannot now use the results of its misconduct to gain additional time to transfer to Plaintiffs the shares owed.

¶ 37 The trial court weighed the evidence and rejected Defendant's assertions. In cases tried to the bench without a jury, we review the record to determine whether competent evidence supports the trial court's findings of fact, and if we find competent evidence to support the trial court's order, we must affirm. *Fackrell v. American Nat'l Bank,* 2005 OK CIV APP 37, ¶ 7, 116 P.3d 201, 204 (citing ·*K & H Well Serv., Inc. v. Tcina, Inc.,* 2002 OK 62, ¶ 9, 51 P.3d 1219, 1223). See also *Sides v. John Cordes, Inc.,* 1999 OK 36, ¶¶ 16, 981 P.2d 301, 307 ("The findings of a trial court sitting without a jury in a case of legal cognizance are to be given the same weight on review as that which would be accorded the verdict of a well-instructed jury.") Even if the record might support a different conclusion, if there is any competent evidence tending to support the findings and judgment of the trial court, the judgment will not be disturbed. *Sides,* 1999 OK 36, at ¶ 16, 981 P.2d at 307.

¶ 38 When there is conflicting evidence presented by both sides as in this case, it is the province of the trier of fact to determine the credibility of witnesses and the weight to be given to the testimony. *Estate of Gerard v. Gerard*, 1995 OK 144, ¶ 18, 911 P.2d 266, 270. These are not questions of law for this Court on appeal. Upon our review ·of the record, we find the trial court's finding for Plaintiffs on their breach of contract claim is supported by competent evidence ·and is affirmed. Plaintiffs' phantom units vested and Defendant failed to timely deliver units within sixty ·(60) days as required under the Plan.[16] The proper amount of damages to be awarded Plaintiffs will be addressed *infra*.

## II. Plaintiffs' Appeal

¶ 39 Plaintiffs counter-appeal, asserting the trial court erred in calculating their damages. In calculating damages, the trial court determined the average unit price for· the sixty (60) days Defendant was required to deliver the units to Plaintiffs to be $9.33. Plaintiffs contend their damages should be calculated at $10.70, the unit price as of August 13, 2008, the date other Plan participants received their units. Plaintiffs contend Defendant decided not to transfer the units on this date and that it knew the SEC filing would be untimely. Thus, a breach occurred on this date.

¶ 40 Defendant disagrees, asserting a unit price of $9.33 was used for purposes of awarding liquidated damages under Plaintiffs' wage claim. With respect to Plaintiffs' breach of contract claim, Defendant asserts damages should be calculated based on the difference in unit price when Plaintiffs ultimately received their units versus when they should have received them.

¶ 41 For the reasons ·previously stated, Plaintiffs are not entitled to a liquidated damages penalty pursuant to §§ 165.1 *et seq.* Accordingly, that portion of the trial court's May 3, 2010, order awarding Plaintiffs a liquidated damages award is reversed.

¶ 42 All Plaintiffs are, however, entitled to damages for breach of contract. Upon reviewing the record, it is undisputed Defen-

dant's Board of Directors convened on August 7, 2008, and determined, *inter alia*, that it would not issue units for certain persons. Plaintiffs. fell within this group and did not receive their units. Defendant's subsequent failure to comply with the SEC's filing requirements was of its own doing and cannot be used to excuse it from timely compliance with its obligations under the Plan. Accordingly, a breach occurred on August 7, 2008, when the Board determined it would not transfer Plaintiffs their units.

¶ 43 With respect to mitigation of damages, the trial court held Plaintiffs Coen, Cooper, Majors, O'Sullivan, Payne, and Purcell failed to mitigate their contractual damages by failing to sell their units when the trading price exceeded $10.70. The court concluded: "Those Plaintiffs had the opportunity to sell their units at a price higher than the price on which they are seeking their calculated damages in this lawsuit, yet failed to do so." Plaintiffs contend this was error.

¶ 44 There is a general duty in Oklahoma to mitigate damages caused by the wrongful acts of others. However, the duty to mitigate damages is not without limits. "Where an injured party finds that a wrong has been perpetrated upon him he should use reasonable means to mitigate or lessen damages. It is only incumbent upon him, however, to use reasonable exertion and incur reasonable expenses in order to do so." *Smith–Horton Drilling Co. v. Brooks*, 1947 OK 154, ¶ 0, 199 Okla. 63, 182 P.2d 499, 500 (syllabus by the court). The burden of proving whether damages could have been avoided or mitigated rests with the party that committed the breach. Accordingly, Defendant had the burden to prove Plaintiffs failed to exercise reasonable efforts to mitigate damages.

¶ 45 To establish its burden, Defendant presented evidence that, after it delivered the units to Plaintiffs, the unit price occasionally exceeded $10.70. Plaintiffs assert this evidence is insufficient, contending Defendant presented no evidence to establish their damages were avoidable, including evidence

---

16. All Plaintiffs' phantom units vested, either

pursuant to the change in control or disability.

the market could have absorbed the units at a price exceeding $10.70.

¶¶ 46 Based upon our review of the record, we agree with Plaintiffs that Defendant failed to meet its burden of introducing evidence establishing some or all of Plaintiffs' damages were avoidable. Defendant's assertions are based on speculation and conjecture and are insufficient to meet its burden. Accordingly, the trial court's May 3, 2010, order finding Plaintiffs Coen, Cooper, Majors, O'Sullivan, Payne, and Purcell failed to mitigate their contractual damages is therefore in error and is reversed. In addition, the cause is remanded to the trial court with directions to calculate Plaintiffs' damages based on the difference in unit price as of August 7, 2008, the date of breach, and the unit price when each Plaintiff ultimately received their units.

### III. Attorney's Fee and Costs Award

¶ 47 For its final proposition of error, Defendant challenges several aspects of the trial court's award of an attorney's fee and costs to Plaintiffs. Plaintiffs sought recovery of fees and costs pursuant to 40 O.S.2001, §§ 165.9 and 12 O.S.2001 and Supp. 2002, §§ 936. The trial court awarded Plaintiffs an attorney's fee and costs of $151,832.17.[17]

¶ 48 Whether a party is entitled to a statutory attorney's fee presents a question of law which will be reviewed *de novo* by this Court. *Kluver v. Weatherford Hosp. Auth.,* 1993 OK 85, ¶ 14, 859 P.2d 1081, 1083. If such an award is proper, the amount thereof is discretionary with the trial court and will not be disturbed absent an abuse of discretion. *See State ex rel. Burk v. City of Oklahoma City,* 1979 OK 115, 598 P.2d 659; *SCS/Compute, Inc. v. Meredith,* 1993 OK CIV APP 124, 864 P.2d 1292.

¶ 49 Section 165.9 permits recovery of fees and costs to an employee upon a successful wage claim. Section 165.9 provides:

A. Action by an employee to recover unpaid wages and liquidated damages may be maintained in any court of competent juris-

diction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and on behalf of all employees similarly situated for such wages....

As we have determined above, Plaintiffs are not the prevailing party on their wage claim and are therefore not entitled to fees and costs incurred in the unsuccessful prosecution of this claim.

¶ 50 Section 936 permits recovery of fees and costs in a civil action for the recovery of labor and services. Section 936 provides:

A. In any civil action to recover for labor or services rendered, or on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law or the contract which is the subject of the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

¶ 51 "The American Rule is firmly established in this jurisdiction. That is, each litigant bears the cost of his/her legal representation and our courts are without authority to assess and award attorney fees in the absence of a specific statute or a specific contract therefor between the parties. Exceptions to the American Rule are narrowly defined." *Eagle Bluff, L.L.C. v. Taylor,* 2010 OK 47, ¶ 16, 237 P.3d 173, 179 (quoting *Kay v. Venezuelan Sun Oil Co.,* 1991 OK 16, ¶ 5, 806 P.2d 648, 650). "Statutes authorizing the award of attorney's fees must be strictly construed," and exceptions to the American Rule are "carved out with great caution" because "liberality of attorney's fees awards" has a "chilling effect on open access to the courts." *Id.*

¶ 52 "[I]t is the underlying nature of the suit itself which determines the applicability of the labor or services provisions of

---

17. The lodestar fee was $102,311.16, supplemental fees were $16,041.00, and a bonus fee of $30,693.35. Plaintiffs were given a thirty percent (30%) fee enhancement. Costs in the amount of $2,786.66 were awarded.

§§ 936." *ABC Coating Co., Inc. v. J. Harris & Sons Ltd.*, 1987 OK 125, ¶ 9, 747 P.2d 271, 273 (footnotes omitted). "The question is whether the damages arose directly from the providing of labor or services, such as the failure to pay for those services, or from an aspect collaterally relating to labor or services." *Id.*

¶ 53 In the present case, Plaintiffs' expectation of entitlement to phantom units derives exclusively from the terms of the Plan and corresponding Agreement. The Plan's purpose was to promote Defendant's interest by compensating "employees, consultants, and directors of the Company and its Affiliates who perform" "superior performance" for or on behalf of Defendant and "to attract and retain the services of individuals who are essential for the growth and profitability of" Defendant. However, until a phantom unit vests Plaintiffs have no interest in the additional compensation regardless of the labor or services rendered to Defendant. Thus, phantom units are not a product of their performance but merely an incentive to en-courage retention and future performance that are purely discretionary until vested pursuant to the terms of the contractual Plan. Section 936 therefore does not provide a basis for awarding an attorney's fee and costs in the present case and we reverse the award of fees and costs to Plaintiffs. The trial court's October 22, 2010, order awarding Plaintiffs an attorney's fee and costs is therefore reversed.

¶ 54 **OPINION ON REHEARING AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

THORNBRUGH, P.J., and RAPP, J., concur.